IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARTIN MARIETTA MATERIALS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BEDFORD REINFORCED PLASTICS, INC., ) <br> WEST VIRGINIA UNIVERSITY RESEARCH ) <br> CORPORATION and HOTA V. GANGARAO, ) <br> ) <br> Defendants. ) | CIVIL ACTION NO. 03-57J <br><br> JUDGE GIBSON |

# Memorandum Opinion and Order of Court

**GIBSON, J.**

This matter comes before the Court on the Plaintiff's Motion Requesting the Court Adopt the Special Master's Final Report and Recommendation on Claim Construction (Document No. 109).

The Court possesses subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331, 1338 as the Plaintiff alleges patent infringement by the Defendants pursuant to 35 U.S.C. §§ 271-273. Venue is proper pursuant to 28 U.S.C. §§ 1391(b), 1400. The Court previously referred this matter to Gale R. Peterson as Special Master (hereinafter "SM") on October 28, 2003 to make recommendations on claim construction. *See* Document No. 54. The Final Report and Recommendation (Document No. 108) was filed on August 3, 2005 and the Plaintiff's Motion was filed on August 19, 2005. The Defendants filed objections (Document No. 111) to the Final Report and Recommendation on August 19, 2005 and the Plaintiff filed a response (Document No. 114) thereto on September 12, 2005.

The Defendants object generally to the SM's Final Report and Recommendation (hereinafter "SM's Report") arguing that it does not comport with the dictates of claim construction announced by the Court of Appeals for the Federal Circuit in *Phillips v. AWH Corp., et al.*, 415 F.3d 1303 (Fed. Cir. 2005).

The Defendants also raise various specific objections to the construction of claim terms made by the SM in his report as to the patents-in-suit, namely Patent No. 6,070,378 (hereinafter "'378 patent") and Patent No. 6,467,118 (hereinafter "'118 patent").

## I. Defendants' Specific Objections to the SM's Report and the analysis of the term "define" by the SM

The Defendants raise four objections to the constructions by the SM of the '118 patent. The objections raised center upon claim 1 of the '118 patent which reads:

> A load bearing deck structure comprising:
>
> at least one sandwich panel formed of a polymer matrix composite material, said sandwich panel comprising a plurality of substantially hollow, elongated core members having side walls, said core members being provided with an upper facesheet and a lower facesheet wherein said facesheets are formed integrally with the side walls of the core members, and wherein at least one of the side walls is disposed at an oblique angle to one of the upper and lower facesheets such that the side walls and facesheets define a polygonal shape when viewed in cross-section.

'118 patent, col. 24, lines 2-14 (hereinafter "claim 1").

The Defendants object to the construction recommended by the SM as to the term "oblique angle." The SM recommended that this term be construed as " an angle that is neither a right angle nor a multiple of a right angle." SM Report, p. 176. The Defendants disagree with this construction presenting several arguments.

First, the Defendants argue that the inventors meant such term "to describe an angle that is formed when two walls connect or intersect." Defendants' Obj., p. 8. The SM disagreed with this construction concluding that the claim language only required that one side wall be disposed at an oblique angle in order to define a polygonal shape in viewing the side walls and facesheets in "cross-section." SM Report, p. 161. The SM went on to review the specification and conclude that a specific measure of angle is not required for the oblique angle within this invention. SM's Report, pp. 170-172. The SM further analyzes the issue of connection or intersecting to form the oblique angle in claim 1, but the SM finds that the Defendants' true issue is with the word "disposed" and if the patentee wanted to claim an intersection between a side wall and an upper or lower facesheet at an oblique angle to define a polygonal shape, language to this effect would be within the claim. SM's Report, p. 174.

Second the Defendants argue that an angle "is only formed when two lines come together at a point" and that the side wall disposed at an oblique angle to the facesheets naturally must connect with a facesheet to form this angle. Defendants' Obj., p. 9. In evaluating the second argument, the Court agrees with the conclusions of the SM. In particular, the Court observes in addition to the SM's reasoning that the positioning of the side walls with respect to the upper and lower walls can be "in a variety of shapes angles with respect to the upper and lower walls." '118 Patent, col. 5, lines 24-25. Furthermore, the presence of the oblique angle "$\propto$" is shown within figure three of the '118 patent and it is present within the elongated core member without the attachment of the facesheets. This is explained by the SM at page 165 of the SM's report and in particular the citation of the specification in the following language: "The oblique angle "$\propto$" of the side wall 48 with respect to the upper wall 64 is preferably 45°, but angles between about 30° and 45° can be provided in alternative embodiments."

'118 patent, col. 10, lines 5-8. Reading this portion of the specification with the preferred embodiment in figure three (see page 8, *infra*) demonstrates the existence of angle "$\propto$" independent of the integral formation of the sandwich panel as defined in the patent. The specification presents more relevant evidence demonstrating the existence of angle "$\propto$" independent from the integration of the core members with the facesheets: "When normalized by weight, the trapezoidal tube **46** with at least a 45° angle between the sidewall **48** and the upper wall **64** and the lower wall **65** has a transverse shear stiffness 2.6 times that of a tube with a square cross-section. Alternatively, for a tube with an oblique angle of about 30°, the transverse shear stiffness is 2.2 times that of a tube with a square shaped cross-section." '118 patent col. 10, lines 31-37. To repeat the analysis of the SM, the language of the claim uses the words "disposed at", in reference to the placement of the sidewall in reference to the facesheet and does not use any words such as "connecting at", "intersecting at" or "forming" which would indicate the meeting of a sidewall and a face sheet to form the oblique angle. Furthermore, the disposal of the sidewall at the oblique angle is to achieve the purpose of having "the sidewalls and facesheets define a polygonal shape when viewed in cross-section" '118 patent col. 24, lines 12-14. The defining of the polygonal shape is obtained when viewing this sandwich panel, as defined, in a cross-section.

However, a polygon is formed by the shape of the core member, not by its integration with the facesheets. The specification language describing the preferred embodiment makes this clear:

> The core members are shown as hollow tubes of trapezoidal cross-section (FIGS. **2**, **3** and **7**). Each of the trapezoidal tubes includes a pair of sidewalls **48**, **49**. One of the sidewalls **48** is disposed at an oblique angle a to one of the upper and lower facesheets **35**, **40** such that the sidewalls **48**, **49** and the upper wall **64** and lower wall **65**, when viewed in cross-section, define a polygonal shape such as a trapezoidal cross-section (FIG **3**).

'118 patent, col. 9, lines 65-67, col. 10, lines 1-5. The specification also notes that a trapezoid is not the only shape that the core members can take. *See* '118 patent, col. 10, lines 40-47. The claim language does not require a connection between the sidewall, which is disposed at an oblique angle, and the upper and lower face sheets and it does not require that the sidewall and one of the facesheets form an oblique angle. SM's Report, p. 174. The oblique angle is formed within the core members themselves with the connection of a sidewall and the upper and lower walls of the core members. As will be analyzed in further detail within, the integration of the facesheets with the elongated core members do nothing to create a connection, intersection or meeting creating the oblique angle, but that the disposition of the oblique angle to the facesheets define the proper formation for the sandwich panel.

Third, the Defendants argue that with the integral formation of the facesheets and the sidewalls with one sidewall disposed at an oblique angle, a polygonal shape is defined and that any sort of "'open'shapes" similar to that suggested by the SM is not what was intended by the inventors. Defendants' Obj., pp. 10-11. Fourth, the Defendants argue that the oblique angle described in the '118 patent is "important to the invention, [and] increases the likelihood that the patent claims covering the invention were intended to include that important feature as it was described" and that such angle is formed from a sidewall and facesheet. Defendants' Obj., pp. 12, 11.

While the Court agrees with the SM's conclusions as to the matters concerning the Defendants' third argument, the Court understands the Defendants' concern within its third argument regarding the SM's discussion of the word "define" and his conclusion that five lines that do not intersect or connect and the drawing of the five lines on page 175 of the SM's Report define a polygonal *shape* (a pentagon in this instance), but not a polygon. While the Court does not adopt the SM's analysis on this matter,

it understands that this exercise on page 175 of his report was meant to make a point of the exercise of claim construction. The Court takes this opportunity to explain its analysis on this matter and present its own analysis that arrives at the same claim constructions of the SM while simultaneously addressing the Defendants' third and fourth arguments presented above and touching upon issues related to the first and second arguments.

The claim language reads "wherein at least one of the sidewalls is disposed at an oblique angle to one of the upper and lower facesheets such that the sidewalls and facesheets define a polygonal shape when viewed in cross-section." '118 patent, col. 24, lines 11-14. The SM stated that "The following may be reasonably said to 'define' a 'polygonal shape,' *i.e.*, one that identifies the essential qualities of a polygonal shape:



even though the lines do not intersect and the figure is not, therefore, a polygon *per se*, although it <u>is</u> a polygonal <u>shape</u>." SM's Report, p. 175.

The Court agrees that in the Defendants' third argument that the inventors never intended that the "polygonal shapes," which are defined when obtaining a cross-sectional view of the sandwich panel, included the "open" shapes as suggested by the SM. The SM used the term "define" as quoted above

in the context of "identifies the essential qualities of." The word "define" has multiple meanings in the English language one of which is "to describe the nature or basic qualities of" and other meanings include "to delineate the outline or form of" and "to specify or fix distinctly." WEBSTER'S II NEW COLLEGE DICTIONARY 296 (2001). The Court agrees with the Defendants' argument that defining a polygonal shape, as those terms were used in claim 1 of the '118 patent, does not mean that a polygonal shape can be defined through a form that includes lines that never intersect or connect. Rather, the word "define" as the Court interprets it and will use within the following analysis, is in the sense of delineating the form of a shape, in this instance a polygon. At the risk of sounding redundant, the word "define" requires a definiteness to it; a certainty in its form. This is clear from the specification language which refers to figure three of the '118 patent. '118 Patent, col. 9, lines 65-67, col. 10, lines 1-5. This is apparent from figure three of the '118 patent:



FIG. 3

Nowhere is the trapezoidal shape of the core members defined by non-intersecting lines. The Court therefore finds that the language of the specification and the non-technical meaning of the word "define" is understood to have the same meaning in this instance: delineating the form of a shape. In this example, the shape is a trapezoid.

However, the Court still agrees with the SM as to the issue that one of the sidewalls and the upper and lower facesheets never connect, intersect or meet to create the oblique angle, contrary to the Defendants' contentions. The claim language requires integral formation of a sandwich panel, as defined by the inventors, that when viewed in a cross-section defines a polygonal shape. Figure three of the '118 patent illustrates the exploded view of a sandwich panel described in that patent, but not yet integrally formed with the trapezoidal shaped elongated core members. Figure seven of the '118 patent demonstrates a cross-sectional view of two sandwich panels after integral formation that are being joined with a key lock:


FIG. 7

The view of the trapezoidal shape is apparent after the integration of the facesheets and core members. To further explain the Court's reasoning, the following illustration is made by the Court:



VIEW 1

In the Court's illustration, the facesheets and the upper and lower walls of the core members are assumed to be formed integrally and the sandwich panel exists after this integration. In View 1 above, the areas labeled as "1" and "2" have the form of trapezoids having a common side and they have such a polygonal shape because of the form of the core members that were integrated with the facesheets to form the sandwich panel. The areas "1" and "2" are formed based upon the shape of the trapezoidal core members, not because of the integration of the facesheets with the core members. That is to say, the addition of the upper and lower facesheets does not add a missing side or piece that create the trapezoidal form shown in the preferred embodiment of figures three or seven in the '118 patent. It is clear from the language of the claim and specification and the illustrations above that the use of the word "disposed" within claim 1 sets forth a different purpose that is not the formation of a trapezoidal or other polygonal shape, but is for the purpose of ensuring proper formation of the sandwich for the deck described in the '118 patent.

It has been noted above that trapezoids and other polygonal shapes may be used to provide a form to the elongated core members. '118 patent, col. 10, lines 40-47. The core members are noted

as being "substantially hollow" and it is apparent from this design that the description of the core members as "having sidewalls" that the core members are in the shape of a polygon, which is a form that is enclosed. Claim 1. Thus, the idea of a polygonal shape is rooted within the design of the elongated core members. The language of the specification proves this: "The core members **46** are shown as hollow tubes of trapezoidal cross-section (FIGS. **2, 3** and **7**)."... "a variety of sizes, shapes and configurations of the elongated core members can be provided. Various other polygonal cross-sectional shapes can also be employed, such as quadrilaterals, parallelograms, other trapezoids, pentagons, and the like." '118 patent col. 9, lines 65-66, col. 10, 40-44. However, the core members are not the sandwich panel in and of themselves.

The Court finds the claim language, specifically the second "wherein" clause of claim 1, which includes the "disposed at an oblique angle...." language, is the basis for evaluating *the proper integration* of the core members with the facesheets to create the sandwich panel and not a description of how the oblique angle is formed. For instance, if one were to attempt to form the sandwich panel, but not follow the claim language and attach the facesheets to the core members while still having one of the sidewalls disposed at an oblique angle to the facesheets, the resulting structure would appear like View 2 in a cross-section because the facesheets could only attach to the core members in one alternative manner, that is by attaching to the sidewalls, instead of the upper and lower walls:



Facesheet (as integrated with a sidewall)

VIEW 2

This resulting formation would be contrary to the claim language and clearly not covered by the patent. In View 2, a polygonal shape of a trapezoid is defined, but not in accordance with the claim language, which requires that the polygonal shape be defined by the sidewalls and the facesheets. Here one facesheet (as integrated with a sidewall), one sidewall of a core member (disposed at an oblique angle), and the upper and lower walls of a core member define the polygonal shape of a trapezoid. When compared with this view, the claim language is understood as requiring a sandwich panel that when properly formed, through whatever process instructed by the patent, presents a polygonal shape through the integration of core members with facesheets such that "wherein at least one of the sidewalls [of a core member] is disposed at an oblique angle to one of the upper and lower facesheets such that the sidewalls and facesheets define a polygonal shape when viewed in cross-section." '118 patent col. 24, lines 10-14 (Claim 1). View 1 above clearly comports with the claim language whereas View 2 does not. View 1 presents a polygonal shape as defined by facesheets (as integrated with the upper and lower walls) and the sidewalls. As the SM concluded, the definition of the term "disposed" is what the Defendants are truly arguing against when they attempt to argue that having a sidewall disposed at an

oblique angle to a facesheet thereby establishes a "natural conclusion" that a connection, intersection or meeting exists between the sidewall, disposed at an oblique angle, and a facesheet. Such is not the case in the '118 patent when one follows the claim language and the specification language in attempting to create the sandwich panel as patented. The Court is therefore in agreement with the SM's analysis on this point. SM's Report, p. 175.

The Court further concludes that the integrated core members' sidewalls and facesheets, define, that is delineate the outline of, a polygonal shape when viewing the sandwich panel in a cross-section. However, the Court understands that the SM's discussion of non-intersecting lines that define a polygonal shape added confusion to his analysis on the issue of defining the claim's phrase "disposed at an oblique angle" when it is clear from the language in the specification that the core members when viewed from the side are in the shape of a polygon, and the "core members being provided with an upper and a lower facesheets *wherein* said facesheets are formed integrally with the sidewalls of the core members, and *wherein* at least one of the sidewalls is disposed at an oblique angle...such that the sidewalls and facesheets define a polygonal shape when viewed in a cross-section." '118 patent, col. 24, lines 7-14. Reading this claim in context, it is apparent that the two "wherein" clauses direct the manner in which the core members are "provided" facesheets, specifically the placement of the facesheets and what a resulting cross-section of a properly integrally formed sandwich panel would appear like to the naked eye.

While the Defendants are correct that the oblique angle is the key to the strength produced in this sandwich panel, and deflection of the facesheet is created by this form, the oblique angle is not created by the connection of one of the sidewalls with the facesheets. It is clear from the specification

that the oblique angle exists and is intact within an elongated core member prior to integration of the facesheets and core members as a sandwich panel.

## II. Compliance with *Phillips*

The Defendants' next objection relates to the manner in which it views the SM's report as not complying with the requirements for claim construction set forth in *Phillips v. AWH Corp., et al.*, 415 F.3d 1303 (Fed. Cir. 2005). In accordance with *Phillips*, a court construing claim terms is to avoid construction of terms in a broad manner by relying upon the meaning of the terms which derive from the patent itself; to achieve this result, the Court of Appeals for the Federal Circuit found that claim construction must rely primarily on intrinsic sources, in particular, the language of claim itself, and the specification which assists in defining claim terms and that placing primary reliance upon extrinsic sources such as dictionaries and treatises in order to establish the meaning of a claim term rather than use of intrinsic sources is incorrect when such extrinsic sources contradict the claim and specification language. *Phillips* at 1320-1324. However, the Court of Appeals did not establish a specific form for claim construction and recognized that the use of different sources in various sequences of analysis is permitted so long as no preference is made for construction of terms that would contradict an unambiguous construction derived intrinsic evidence, such as the specification. *Phillips* at 1324.

A review of the SM's Report reveals that the SM has complied with the manner of construing patent claims as set forth in *Phillips*. While the SM does refer to extrinsic evidence at times, such as dictionaries and different internet world wide web sites, such use of extrinsic evidence did not violate the dictates of *Phillips*. The SM consistently gave the intrinsic evidence, particularly the language of the claim and the specification, due deference. Although the references to extrinsic evidence may be

in an order of presentation which one may find to be indicative of primary reliance on such sources, a specific order of presentation or review of evidence is not mandated by *Phillips*. *Phillips* at 1324. The SM gave proper weight to the intrinsic evidence in relation to any extrinsic evidence. The Court will now address specific references to the SM's Report in regard to the Defendants' objections on this matter.

While it is clear that the SM utilized common dictionary definitions in his analysis of the terms "disposed at an oblique angle," this use of dictionary terms was not inappropriate, but consistent with the claim language. SM's Report, pp. 160-176. In the beginning of the SM's discussion concerning the "disposed" issue, he relies upon the claim language but recognizes that the common dictionary definition of "disposed" presents the same meaning as the sense that word is used in the claim language and therefore cites to the specification language to buttress this conclusion. SM's Report, p. 160. The SM then dissects the idea of "oblique angle" and begins with the claim language, considers the idea of "'customary' meaning," that is the meaning understood by one familiar in the art after considering the patent language and then moves onto the specification language and if that language provides interpretation of the claim term as it would be customarily understood in the patent's claim. SM's Report, pp. 161-164; *Phillips* at 1321. The SM further evaluates the specification language and embodiments and related patents as well as specialized and common dictionary meanings and the language of claim 1 again. SM's Report, pp. 165-172. The SM concludes that the meanings of "oblique angle" are the same whether one considers the patent language, or the common English or customary definition within the art meanings of that term and this is not contrary to the precedent in *Phillips*. SM's Report, pp. 172-173. Furthermore, the SM relies on the language of claim 1 to address

the Defendants' concern regarding the construction of the term "disposed." SM's Report, p. 175. Aside from the exercise with the word "define" and the analysis thereon made by the SM, and the substituting of the Court's analysis on that matter for the SM's analysis of the word "define," the SM complied with the dictates of *Phillips* in the manner in which he conducted his construction contrary to the Defendants' objections. Defendants' Obj., pp. 13-16; SM's Report, pp. 175-176. These objections are denied.

Contrary to the Defendants' contention, the angle at issue in claim 1 of the patent is not formed when two structures come together, but the angle is formed by the inherent nature of the core member and the intersection of one of its sidewalls and upper or lower walls. Defendants' Obj., pp. 16-17. The "disposal" or arrangement of the sidewall to the facesheet establish the proper formation of the sandwich panel. In light of the Court analysis above, this will not be addressed again. These objections are denied.

The Defendants' remarks as to the disparagement of triangles has also been evaluated closely and again the Court agrees with the SM. See Defendants' Obj., pp. 17-18 The Defendants' contend that triangular shaped core members are not included within the patent, but the SM disagreed finding no such limitation within the patent. SM's Report, pp. 167-170, 171 n 37. The Defendants' quotations on page 17 and 18 of its objections point to an issue with regard to use of the triangular shape in the sandwich panel, specifically with regard to the language: " with composite materials has presented problems of failure in the resin bonded nodes of the triangular shape. Therefore, a modular structural composite component for structural supports is needed which overcomes this problem." '118 patent col. 3, lines 38-44. *Without re-quoting the next quotation* used by the Defendants, it is important to read the Defendants' quotation with the unquoted preceding sentence which reads: "It is believed that such

forming overcomes the problem of node failure experienced in forming triangular shapes with composite materials." '118 patent col. 11, lines 18-20. Reading this sentence in context with the surrounding language reveals that this specific problem with node failure in triangular shapes of composite materials can be overcome through the manner of hand layup described in the preceding paragraph. '118 patent col. 11, lines 9-28. Therefore, the disparagement of triangular shapes is made in the context of the manner of using such shapes in the formation of the core members. This objection is denied.

To address the Defendants' argument that no recommendation has been made as to the issue of whether a "connection/intersection/meeting" between the sidewall disposed at an oblique angle and upper and lower facesheets, the Court finds that such sidewall is not required to be connected to, intersected with or meet with the upper and lower facesheets. See Defendants' Obj., p. 18. It is clear from the SM's Report that this issue was addressed and was found to require no connection between the sidewall and facesheets. SM's Report, pp. 160-161. The SM addressed this issue again in response to the Defendants' comments and the Court need not repeat that response here. SM's Report, pp. 173-176. The SM's recommendation did not include language referring to any "connection/intersection/meeting" because his analysis did not find that the language of the claim regarding "disposed at an oblique angle" was intended to mean or refer to such a meaning-this is clear from the SM's analysis. This objection is denied.

### III.  Construction of "Sandwich Panel"

The Defendants' next objection is to the construction of the term "sandwich panel" as set forth in the SM's Report. Defendants' Obj., pp. 19-25. The Defendants argue that the meaning of the term

16

"sandwich panel" does not include the understanding that such a structure can be formed as one piece, but only formed from the unification of different components. Defendants' Obj., pp. 21-23. The Defendants argue that the SM's report on this issue violates the precedent of *Phillips* by using a "whittling down" approach through requiring the Defendants to prove the pultrusion process was not included as a method forming the "sandwich panel" as one piece rather than assembly of separate components. Defendants' Obj., p. 23. The Defendants would construe the '118 patent's term "sandwich panel" to be a panel formed by the attaching of facesheets to a "pre-existing core." Defendants' Obj., p. 25.

While the SM's discussion of "sandwich panel" in the '378 patent, as it is understood in the ordinary meaning of the term within the relevant art (see SM's report, page 84-88), may not ordinarily include the idea of pultruding a "sandwich panel" as one piece, the language of the specification clearly contemplates the idea of this process in the formation of both patents. *See* '378 patent, col. 10, lines 11-14, 67, col. 11, lines 1-3. '118 patent col. 11, lines 53-56, col. 12, lines 48-52. The Defendants interpret the claim language of both patents contrary to the findings of the SM, and now of this Court, and argue that because such patents are overbroadly interpreted the Defendants are forced to whittle down such constructions of this Court and are burdened to prove the proper construction of the patents. This is an incorrect interpretation as the specification language for the '118 and '378 patents clearly contemplate the inclusion of the idea of forming "sandwich panels" as a "unitary structural component" and being "fabricated as a single component such as by pultruding a single sandwich panel" and the Defendants have failed to prove its proposed construction from the language of the claim, specification, prosecution history and other evidence. '378 patent, col. 10, lines 11-14, 67, col. 11, lines 1-3; '118

patent col. 11, lines 53-56, col. 12, lines 48-52. Moreover, the language of both patents refer to "pultrusion or other suitable forming methods" as the manner to form the unitary structural component thereby leaving open the possibility of using other formation processes that fabricate the invention as one piece rather than through the assembly of distinct pieces. '118 patent col. 11, lines 55-56, '378 patent col. 12, lines 13-14. Thus, the SM correctly concludes that the formation of the "sandwich panel" is not restricted to formation using either "distinct" or "indistinct" pieces. SM's Report p. 97. The Court also agrees with the SM that the patents-in-suit do not concern product-by-process claims, but are apparatus claims. *See* SM's Report, pp. 76, 93, 96, 150-153. Most importantly, the language explaining the alternative avenues of forming the "sandwich panel" contemplates that that term in the patents is different from what the Defendants' would construe such term as being based upon the understanding of the ordinary meaning of a "sandwich panel" in the relevant art at the time of the patent. *See* SM's Report, pp. 84-88. The guidance of the specification provides the most weight and the basis for the SM's conclusion. It is clear that the specification language contemplates the assembly of distinct parts to create a "sandwich panel" or the formation of a "sandwich panel" as one modular piece which "can be fabricated as a single component such as by pultruding a single sandwich panel...." '378 patent col. 11, lines 1-2; '118 patent col. 12, lines 48-52. The Defendants' argument for ignoring the specification language to this effect and arguing for construing the claim based upon ordinary meaning within the industry without reference to the specification language is contrary to *Phillips* and contrary to their previous reliance on *Phillips* in their objections by arguing that the SM violated its holding when he proceeded to ignore the patents' specification language and concentrated on the plain meaning thereby placing the burden upon the Defendants. The Court finds that the specification

language is dispositive on this matter. *See Phillips* at 1315. The Defendants' choice to focus upon either the specification language or the plain meaning of the word when it suits their proposed construction is unavailing. The Defendants' objection is denied.

AND NOW, this 18th day of August, 2006, this matter coming before the Court on the Plaintiff's Motion Requesting the Court Adopt the Special Master's Final Report and Recommendation on Claim Construction (Document No. 109), in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the proposed construction of the terms by the Special Master are adopted as the construction of such terms by this Court; IT IS FURTHER ORDERED THAT the analysis of the Special Master as to these construction of terms is also adopted as the analysis of this Court with the exception of the analysis of the word "define" by this Court in Section I of the foregoing Memorandum Opinion is substituted for the analysis as proposed by the Special Master on page 175 of his Final Report and Recommendation as to that word.

BY THE COURT:

_____
KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE